759 So.2d 1082 (2000)
Linda TODD, Plaintiff-Appellee,
v.
SECURITY INDUSTRIAL INSURANCE, Defendant-Appellant.
No. 33,233-WCA.
Court of Appeal of Louisiana, Second Circuit.
May 15, 2000.
Rehearing Denied June 15, 2000.
*1084 Casten & Pearce, by Claude W. Bookter, Jr., Shreveport, Counsel for Defendant-Appellant.
James E. Franklin, Jr., Shreveport, Counsel for Plaintiff-Appellee.
Before STEWART, DREW and SAMS (Pro Tem.), JJ.
SAMS, J., Pro Tem.
Both the employer, Security Industrial Insurance, and the claimant, Linda Todd, appeal aspects of a judgment that awarded Ms. Todd supplemental earnings benefits ("SEB"), fixed her compensation rate, assessed penalties and attorney fees, and rejected her claim for further medical treatment. For the reasons expressed, we affirm in part, amend in part, reverse in part, and render.

Factual background
Ms. Todd began working for Security on October 1, 1996 as a "debit agent." Her job was to call on policy holders, collect premiums, note their payments, and try to develop new accounts. On Saturday, October 26, en route to a collection near the Shreveport Downtown Airport, she made an unprotected left turn and collided with an oncoming car. She injured her neck and shoulders and jammed the middle finger of her left hand into the steering wheel. She was taken to Schumpert Hospital, where doctors placed her neck in a brace. Ms. Todd has not worked since the day of the accident, and she has undergone three operations on her dominant left hand.
In early November, Security paid Ms. Todd for her month's work, $757.23. Security is a self-insured employer which uses a third-party administrator, Risk Management Services, to handle compensation matters. On the recommendation of Risk Management's adjuster, Jodi Jacobsen, Security has paid Ms. Todd weekly compensation benefits at the statutory minimum, $93.00 a week, since the accident. Security has also paid medical benefits of more than $22,000.
Ms. Todd has sought and received treatment from several doctors. She initially saw Dr. Don Burt, an orthopedic surgeon at the Bone & Joint Clinic. He diagnosed cervical and lumbar myeloligamentous strain and a moderate contusion of the left hand. Starting in December 1996, she began seeing two different orthopedic surgeons: Dr. Clint McAlister, at Orthopedic Specialists of Louisiana, for her hand, and Dr. Gordon Mead, at Highland Clinic, for her neck and shoulder complaints. Dr. McAlister performed surgery in December *1085 1996 to repair a boutonniere deformity in her left middle finger. This was not successful; Ms. Todd continued to suffer with pain and swelling. By May 1997 Dr. McAlister was recommending fusion of the PIP joint, and a second opinion by Dr. Marion Milstead confirmed this as a "last resort." Ms. Todd resisted further surgery until March 1998, when Dr. McAlister performed the fusion; later, he performed a third operation to remove pins from the fusion. By November 1998, Dr. McAlister felt she had reached maximum medical improvement, but assessed a 50% disability of the finger and 8% of the hand. As a result of the fusion, Ms. Todd cannot bend the middle joint of her middle finger, cup her hand or grasp small objects. Dr. McAlister has always maintained that Ms. Todd cannot return to work as a debit agent because her job entails "persistent writing." However, he testified there was "nothing medically wrong" with attempting to return to work. Ms. Todd testified that she can write only "a bit," not for long, and for this reason she was unable to work as a debit agent.
Meanwhile, Dr. Mead treated her back and shoulder complaints with physical therapy, which Ms. Todd attended between mid-December 1996 and late April 1997. She did not respond well to therapy, so in March 1997 Dr. Mead ordered an MRI which showed mild bulging at C4-5 and C6-7, but no cord compression. At this point Dr. Mead was unable to explain her subjective complaints with objective findings. He referred her to another orthopedic surgeon, Dr. Carl Goodman, who advised her to discontinue physical therapy, and by May 1997 he felt she had reached maximum medical improvement.
Unhappy with the results from her orthopedists, Ms. Todd sought (and Ms. Jacobsen approved) treatment with a neurosurgeon, Dr. Warren Long. He diagnosed a chronic cervical sprain with no radiculopathy. He recommended conservative treatment and therapy on a MEDEX machine for four to six weeks, followed by a functional capacity evaluation. On May 12, 1997, Ms. Jacobsen sent Dr. Long a fax, saying she was unfamiliar with the MEDEX machine and asking whether it was necessary. Ms. Jacobsen testified that she never received any response from Dr. Long and thus never approved the MEDEX treatment. (Ms. Todd did eventually take a functional capacity evaluation in August 1998.) Ms. Todd testified that her neck still hurts, worst of all when she turns her head, or when she looks down, as would be required to make entries in her log book. For these reasons she felt she could not return to her job for Security.
Ms. Todd filed the instant disputed claim in June 1997. She did not allege her rate of pay, but claimed that Security refused to provide medical treatment for her neck. By an "amended basis of dispute" filed in December 1997, she alleged that she was not a commission employee, but had been hired on the promise of making $1,800 a month. She reiterated that Security had refused to authorize treatment with Dr. Long, her choice of neurosurgeon.
Security countered that according to the employment contract she signed on October 1, 1996, Ms. Todd was indeed a commission employee, whose pay was based on a graduated percentage of debits collected, and certain amounts for new policies sold. Security maintained that its calculation of weekly benefits was proper under the statute, and denied that it had ever refused any medical treatment. It also contended that Ms. Todd was indeed able to work.
The matter came to trial in April 1999. Most of the testimony concerned the nature of Ms. Todd's job and compensation. Ms. Todd maintained that Johnny Matthews, the staff manager who hired her, had promised her a salary of $1,800 a month plus commissions, but she could not dispute the employment contract, introduced as Exhibit D-4. Ms. Todd's district manager, Ronald Brown, explained that under the contract, she was entitled to 16% commission on her debit collections plus a dollar-for-dollar bonus, up to $100, on new policies she sold. He testified that Ms. Todd earned, in one month's time, *1086 virtually the maximum possible based on the size of her debit book, $4,287.
Both Ms. Todd and Mr. Brown testified that for the first two weeks of her employment, she rode around with managers or other established collectors, meeting her customers and learning the area. Ms. Todd testified that after the training ended, around mid-month, she received her own debit book and made calls on her own, working six days a week. Although she testified that she had worked since October 1, she felt that she was credited for her collections and commissions only after October 15. Brown referred to the first two weeks of work as "definitely training," but testified (along with Matthews) that she was properly credited for all collections and sales, both before and after receiving her debit book. They admitted, however, that until October 15 there was no "paper trail" to show complete credit for her collections.
Finally, despite her claims of permanent neck pain and disability in her left hand, Ms. Todd admitted that she had twice returned to Security and reapplied for her old job. She filled out an application in January 1999 (about three months prior to trial), but testified that she must write very slowly and her handwriting is poor. She testified that Mr. Brown refused to hire her because she did not have transportation, having totaled her van in the work-related accident. She admitted that her husband owns two vehicles (and uses a company truck for work), but said she could not borrow either of these, as her husband depends on them. Brown corroborated that a vehicle is virtually essential for a debit agent, and Security does not provide transportation for its employees.
In written reasons for judgment, the WCJ found that Ms. Todd worked only 17 days in October 1996, earning a prorated salary of $757.23. She further found that Ms. Todd worked seven days a week, which yielded an average weekly wage of $311.50. The WCJ rejected Ms. Todd's contention that she was entitled to earn $1,800 a month, as well as her claim that Security wrongly refused to provide the therapy recommended by Dr. Long. However, the WCJ found that Security did not prove there was a job available to Ms. Todd within her physical restrictions and reasonable geographic region because (1) Security did not offer her a modified job with less writing, (2) Security did not confirm any of its job offers in writing, (3) Ms. Todd's personal transportation was lost as a result of the work-related accident, and (4) Security did not offer her any remuneration to obtain alternative transportation. The WCJ therefore awarded Ms. Todd SEB of $892.94 per month, with credit for the $93 a week paid since the accident. Finding that Security's improper calculation of the compensation rate was arbitrary and capricious, the WCJ assessed a penalty of $2,000 and attorney fees of $4,000.
As noted, Security has appealed, contesting the finding of disability, the calculation of weekly indemnity benefits, and the imposition of penalties and attorney fees. Ms. Todd has answered the appeal, disputing the amount of weekly benefits as well as the WCJ's failure to order the therapy recommended by Dr. Long. She seeks additional penalties and attorney fees.

Discussion: Supplemental earnings benefits
By its second assignment, Security urges the WCJ was plainly wrong to award Ms. Todd SEB. Security alleges two factual errors. First, the treating physician, Dr. McAlister, restricted her from work that involved "persistent writing," based solely on Ms. Todd's description of her work; however, when at deposition Dr. McAlister learned that the job actually entailed making notations every 15 or 20 minutes, he said the only impediment to resuming that work was "subjective pain." Second, Ms. Todd's lack of a vehicle should not factor into her ability to work. In support, Security cites Mayeux v. Kentucky Fried Chicken, 28,163 (La.App. 2 Cir. 4/3/96), 671 So.2d 1261, writ denied *1087 96-1133 (La.6/7/96), 674 So.2d 966, and distinguishes Daugherty v. Domino's Pizza, 95-1394 (La.5/21/96), 674 So.2d 947.
Under R.S. 23:1221(3), a claimant is entitled to receive SEB if she sustains a work-related injury that renders her unable to earn 90% or more of her pre-injury wage. Initially, the claimant bears the burden of proving by a preponderance of the evidence that the injury resulted in her inability to earn that amount, under the facts and circumstances of the individual case. Seal v. Gaylord Container Corp., 97-0688 (La.12/2/97), 704 So.2d 1161. This determination is guided by the precept that the Compensation Act must be liberally construed in favor of finding coverage. See, Daigle v. Sherwin-Williams Co., 545 So.2d 1005 (La.1989). Once the claimant makes this showing, the burden shifts to the employer to prove by a preponderance that the claimant is physically able to perform a certain job and that the job was offered to her or was available to her within her (or the employer's) community or reasonable geographic region. R.S. 23:1221(3)(c)(i). If the employer meets this burden, then the claimant must show, by clear and convincing evidence, that she is unable to perform the offered or available work solely because of substantial pain. R.S. 23:1221(3)(c)(ii). The WCJ's findings, as to both the claimant's and the employer's burdens of proof, are factual in nature and subject to manifest error review. Seal v. Gaylord Container Corp., supra.
As noted above, the evidence was seriously contested. Ms. Todd maintained that she could not return to work as a debit agent both because the pain and permanent disability of her dominant hand made it difficult for her to write, and because the residual pain in her neck made it difficult for her to enter and exit a car and drive safely. She somewhat undermined her position by twice reapplying for her old job, thus suggesting that she was indeed able to perform its writing and driving requirements. Dr. McAlister assessed a 50% disability of her left long finger and 8% of the left hand, and was fairly consistenteven after learning that the job did not involve "persistent" writingthat she was disabled from working as a debit agent because of pain. The functional capacity evaluation recommended accommodating the old job by giving her more time for writing. Her complaints of neck pain were perhaps less compelling, as both Dr. Mead and Dr. Goodman recommended that she return to work, and neither could explain her symptoms by the mild bulging discs noted in the March 1997 MRI. Dr. Long, the neurosurgeon, apparently accepted her complaints, diagnosing chronic cervical sprain.
Mindful of the fact finder's great discretion in weighing evidence and assessing credibility, and the rule of liberal construction of the Act, we cannot say the WCJ was plainly wrong to find that Ms. Todd showed, clearly and convincingly, that she was unable to resume her work for Security solely because of substantial pain. Security's argument based on Mayeux v. Kentucky Fried Chicken, supra, is not persuasive. That case concerned whether a similar job in Vicksburg, Mississippi, is within the same reasonable geographic region as the claimant's domicile of Tallulah, Louisiana, some 20 miles away.[1] The instant case does not really involve a long commute, but rather the physical demands of calling on numerous clients a day, each time getting out and back into the car, and negotiating city traffic. The WCJ was definitely entitled to find that these aspects of the job would cause substantial pain to someone with Ms. Todd's symptoms.
*1088 This assignment of error lacks merit. The finding that Ms. Todd is entitled to SEB is affirmed.

Computation of benefits
By her first assignment of error, Ms. Todd urges the WCJ committed manifest error in calculating her indemnity amount. Initially, she concedes the WCJ was correct to find that she did not begin to work until October 15, when she received her own debit book. However, she contends that between October 15 and 26, the date of the accident, she actually worked 12 days, not the 17 found by the WCJ. Dividing her total pay by 12 days yields a daily wage of $63.10 per day. She further argues that multiplying the daily wage by seven, the number of days she proved she worked each week, yields an average weekly wage ("AWW") of $441.70. She concludes that based on this AWW, the monthly comp rate for SEB is $1,266.84, and not the $892.94 awarded by the WCJ.
By its first assignment, Security also contests the WCJ's computation. Factually, it urges there is no record evidence to support the finding that Ms. Todd did not start work until October 15, or that she worked seven days a week. It submits that the WCJ's finding of an AWW of $311 is absurd, since both Ronald Brown, the field manager, and Johnny Matthews, the staff manager, testified that at $757 she had virtually "maxed out" with her current debit book. Security further argues that based on the correct number of days worked, 22, her daily wage was $34.42, and a correct application of the statute, R.S. 23:1201(10)(d), yields an AWW of $137.68. Two-thirds of this amount yields a comp rate of $91.80, thus entitling Ms. Todd to the statutory minimum of $93 per week. Security submits that it has properly paid her this amount since shortly after the accident.
We have closely examined the record evidence and are constrained to find factual and legal errors involving the computation. Not only Ms. Todd, but every witness on behalf of Security, testified that she began working on October 1, the first day she rode with Johnny Matthews. There is no question that during her two-week training period, she was rendering service to Security; she is therefore deemed to be an employee during this time. La. R.S. 23:1044. There is little doubt that if the accident had occurred during her first two weeks, "arising out of and in the course of her employment, it would have been covered by the Act. La. R.S. 23:1031 A. Security's failure to enter her on the company books or give her a debit book until October 15 will not alter her employee status or negate the service she performed prior to that date. The WCJ was patently wrong to find that employment did not begin until October 15. The record preponderates to show that it began on October 1.
Moreover, Ms. Todd testified that she worked six days a week; Ms. Jacobsen corroborated that this was the norm for Security debit agents. Johnny Matthews recalled that she worked only every other day. In short, there is no factual basis for the WCJ's finding that Ms. Todd worked seven days a week. This record preponderates to show that she worked six days a week, for a total of 22 days, between October 1 and 26, 1996. Because of this finding, Ms. Todd's first assignment of error lacks lack merit.
Furthermore, the compensation rate for commission employees is regulated by La. R.S. 23:1201(10)(d). At the time of Ms. Todd's accident,[2] this statute provided as follows:
The average weekly wage shall be determined as follows: * * * (d) If the employee is employed on a unit, piecemeal, commission or other basis, his gross earnings from the employer for the twenty-six week period immediately *1089 preceding the accident divided by the number of days the employee actually worked for the employer during said twenty-six week period; provided, however, that if such an employee has worked for the employer for less than a twenty-six week period immediately preceding the accident, his gross earnings from the employer for the period immediately preceding the accident divided by the number of days the employee actually worked for the employer during said period and multiplied by four. (Emphasis added.)
Ms. Todd was a commission employee who worked for Security less than 26 weeks before the accident, so this section applies. Her gross earnings, $757.23, divided by the actual number of days worked, 22, yields a daily wage of $34.42. According to the statute, this quotient is multiplied by four to yield an AWW of $137.68. SEB is premised upon an average monthly wage, which is defined as the AWW times 4.3; thus, Ms. Todd's average monthly wage is $592.02. R.S. 23:1221(3)(a). The compensation rate is 662/3% of the average monthly wage, or $394.68. SEB is not subject to the statutory minimum. La. R.S. 23:1202 A(2). The WCJ's calculations did not follow this formula and are legally wrong.
The parties stipulated that Security has paid weekly benefits of $93 since shortly after the accident. In brief, Security asks this court to reinstate that award. The weekly payments yield a monthly total of $399.90; this slightly exceeds the monthly total under R.S. 23:1221(3). However, in light of Security's prayer for relief we will render judgment in the amount prayed for, or $399.90 per month. La. C.C.P. art. 2164.

Penalties and attorney fees
By her third assignment of error, Ms. Todd urges the WCJ awarded a grossly inadequate attorney fee. She submits that her attorney has incurred billable hours of $9,712.00, and expenses of $1,383.46, so she requests that the attorney fee be raised to at least $12,000. By her fourth assignment she requests additional attorney fees for responding to Security's appeal.
Security contends by its third assignment of error that because it properly calculated the compensation rate, there is no basis to assess penalties or fees. Even if its calculation is incorrect, Security urges the error was in good faith (as even the WCJ misapplied the formula of R.S. 23:1201(10)(d)) and cannot be considered arbitrary and capricious behavior under R.S. 23:1201.2.
The employer or insurer must pay indemnity benefits within 14 days of notice of the injury and loss; failure to pay timely subjects the liable party to a penalty of 12%, $50 per day, or a maximum of $2,000, unless "the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control." La. R.S. 23:1201 E; Brown v. Texas-LA Cartage Inc., 98-1063 (La.12/1/98), 721 So.2d 885. The Act also provides for attorney fees to be assessed against any employer or insurer who discontinues payment of benefits, when "such discontinuance is found to be arbitrary, capricious, or without probable cause." La. R.S. 23:1201.2; Williams v. Rush Masonry Inc., 98-2271 (La.6/29/99), 737 So.2d 41. The instant award is based on a failure to pay the correct compensation rate and is therefore governed by R.S. 23:1201 E, the reasonably controverted standard. Brown v. Texas-LA Cartage Inc., supra.
This court has determined that Security did not miscalculate Ms. Todd's compensation rate, and in fact has paid her an appropriate indemnity rate since shortly after the accident. There is no "nonpayment" on which to base this award under R.S. 23:1201 E. Thus the award of penalties and attorney fees must be reversed. Cleveland v. Delhi Guest Home, 29,506 (La.App. 2 Cir. 5/7/97), 694 So.2d 607; Crotwell v. Holloway Sportswear, 32,038 (La.App. 2 Cir. 6/16/99), 740 So.2d 748. Because Security's appeal raised a meritorious *1090 claim, we reject Ms. Todd's claim for additional attorney fees. Johnson v. Breck Const. Co., 32,311 (La.App. 2 Cir. 9/22/99), 743 So.2d 296.

Additional therapy
By her second assignment of error, Ms. Todd urges the WCJ was plainly wrong in refusing to authorize therapy recommended by Dr. Long. She contends that the WCJ simply misinterpreted Dr. Long's report as not really requesting MEDEX therapy, and that Ms. Jacobsen's failure to follow up and ascertain the nature and necessity of the treatment amounted to arbitrary and capricious conduct.
Ms. Todd selected Dr. Long as the neurosurgeon to examine and treat her continued complaints of back pain. Ms. Jacobsen testified that on April 16, 1997 she approved an examination by Dr. Long. Dr. Long examined her on April 18 and wrote the following:
This lady has a chronic cervical sprain. I do not think that she has any radiculopathy. I would treat this lady very conservatively and send her to Mr. Eberhardt to put her on the MEDEX machine for about 4-6 weeks, and then send her for a Functional Capacity Exam and try to get her back into the work force.
On May 12, Ms. Jacobsen faxed Dr. Long the following message:
Dr. Long,
Thank you for your report of 4/18/97. You recommended MEDEX machine. Since that time, Dr. Mead and Dr. Goodman have released her to return to work. Please explain why this MEDEX machine is necessary. I am not familiar with it. Thank you.
The fax log report indicated that Dr. Long's office received this message at 2:10 p.m. on May 12. Ms. Jacobsen testified that she received no response. She admitted that she never phoned him back or sent any further faxes to press for the requested information. She also admitted that she never authorized the MEDEX treatment.
The manifest error standard applies not only to the WCJ's assessment of live witnesses but also her evaluation of documentary evidence. Alexander v. Pellerin Marble & Granite, 93-1698 (La.1/14/94), 630 So.2d 706. Here, the WCJ found that Ms. Todd failed to prove "that Dr. Long actually requested that such treatment be commenced." Dr. Long's "recommendation" is phrased in a tentative and conditional way; tellingly, he never reiterated it. On these facts, the WCJ was not plainly wrong to find no actual request for treatment. The WCJ further found that Ms. Jacobsen did not receive enough information to assess whether the MEDEX therapy was reasonable. Considering that Ms. Jacobsen specifically requested additional information, and that two orthopedic surgeons had released Ms. Todd to resume working, we detect no manifest error in the WCJ's finding. Ms. Todd asserts in brief that Ms. Jacobsen had a continuing duty to follow up Dr. Long's ambiguous letter, but she cites no authority in support. Normally the burden of proof rests on the claimant to show that the proposed treatment is necessary and related to the compensable accident. Chitman v. Davison Trucking, 28,073 (La.App. 2 Cir. 2/28/96), 669 So.2d 671. This record shows that Security sent Ms. Todd to five orthopedic surgeons, one neurosurgeon, four months of physical therapy, and a functional capacity evaluation. We cannot agree that Security failed to make an adequate effort to ascertain her true medical condition. Cf., Aymond v. R.J. Jones & Sons, 96-443 (La.App. 3 Cir. 11/20/96), 690 So.2d 769. This assignment of error lacks merit.

Conclusion
For the reasons expressed, we render judgment as follows: (1) The judgment is AFFIRMED insofar as it finds Ms. Todd is entitled to supplemental earnings benefits and rejects her claim for additional therapy; (2) The judgment is AMENDED to fix the amount of SEB benefits at *1091 $399.90 per month in accordance with R.S. 23:1221(3); (3) The award of penalties and attorney fees is REVERSED. Costs of appeal are assessed to the claimant, Ms. Todd.
AFFIRMED IN PART, AMENDED IN PART, REVERSED IN PART, AND RENDERED.

APPLICATION FOR REHEARING
Before WILLIAMS, STEWART, KOSTELKA, DREW and SAMS, J. Pro Tem.
Rehearing Denied.
NOTES
[1] By contrast, in another case we affirmed the WCJ's holding that jobs in Delhi and Rayville, La., were not in the reasonable geographic area as the claimant's domicile of Tallulah. Delhi is 15 miles away, and Rayville, 40. Henton v. Walker & Wells Contractors Inc., 25,821 (La.App. 2 Cir. 5/4/94), 637 So.2d 672, writ denied 94-1491 (La.9/23/94), 642 So.2d 1295.
[2] This statute was amended by La. Acts 1997, No. 423, effective August 15, 1997. The claimant's compensation rate is fixed as of the date of the accident. La. R.S. 23:1021(10); Adams v. Nola Fleet Shipyard, 92-2100 (La. App. 4 Cir. 3/30/93), 617 So.2d 88.